1

2

3

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

4

5

6

7

8

9

10

11

12

13

WILLIAM TERRELL, Guardian Ad
Litem for QUENTIN SLAGOWSKI, a
minor; ANIKA SLAGOWSKI, a minor;
and ROWAN SLAGOWSKI,

Plaintiffs,

v.

CENTRAL WASHINGTON ASPHALT, INC.;
DONALD HANNON; JAMES WENTLAND;
and JERRY GOLDSMITH,

Defendants.

_____

AND ALL RELATED MATTERS.

Case No. 2:11-cv-00142-APG-VCF

**ORDER GRANTING IN PART AND
DENYING IN PART  CWA
DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT**

(Dkt. Nos. 430, 431, 432, 433, 434, 435, 436,
437)

14      This lawsuit arises out of a serious car accident that resulted in injuries to multiple people

15 and the death of Jon Michael Slagowski.  Defendants/third party plaintiffs Central Washington

16 Asphalt, Inc. ("CWA"), Donald Hannon, James Wentland, and Jerry Goldsmith (together, the

17 "CW Defendants") move for summary judgment on some of the claims brought against them by

18 the Slagowski Plaintiffs[1] and the Zemke Plaintiffs,[2] who sued the CW Defendants for allegedly

19 causing the accident. (Dkt. #329; Dkt. #331; Dkt. #332.)

20      I set out the basic background facts of the car accident in a prior order (Dkt. #445) and the

21 parties are familiar with the facts, so I will not repeat them here except where necessary.

22 Summary judgment is appropriate if the pleadings, discovery responses, and affidavits

23 demonstrate "there is no genuine dispute as to any material fact and the movant is entitled to

24 judgment as a matter of law." Fed. R. Civ. P. 56(a), (c).  A fact is material if it "might affect the

25

26

27

28

_____

[1] William Terrell as guardian ad litem for Quentin, Anika, and Rowan Slagowski, and Patricia
Dean as personal representative of the Estate of Jon Michael Slagowski.

[2] Kathryn and Mitchell Forest Zemke.

1  outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

2  (1986).  An issue is genuine if "the evidence is such that a reasonable jury could return a verdict

3  for the nonmoving party." *Id.*

4        The party seeking summary judgment bears the initial burden of informing the court of the

5  basis for its motion and identifying those portions of the record that demonstrate the absence of a

6  genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden

7  then shifts to the non-moving party to set forth specific facts demonstrating there is a genuine

8  issue of material fact for trial. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir.

9  2000).  I view the evidence and reasonable inferences in the light most favorable to the non-

10  moving party. *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008).

11  **I. ANALYSIS**

12        In count one of their amended complaint, the Slagowski Plaintiffs allege (1) CWA

13  negligently entrusted its vehicles to Hannon, Wentland, and Goldsmith; (2) Wentland negligently

14  told Hannon it was clear to pass; and (3) Hannon negligently forced Zemke off the road while

15  executing the passing maneuver. (Dkt. #329 at 4-5.)  In count two, they assert the CW Defendants

16  aided and abetted each other in driving while fatigued. (*Id.* at 6-7.)  Finally, Jon Michael

17  Slagowski's estate seeks punitive damages against each of the CW Defendants.

18        Kathryn and Mitchell Zemke assert similar claims for negligence in count one of their

19  amended complaints. (Dkt. #331 at 3-4; Dkt. #332 at 3-4.)  They each assert a loss of consortium

20  claim in count two. (Dkt. #331 at 5-6; Dkt. #332 at 5-6.)  Kathryn Zemke asserts a negligent

21  infliction of emotional distress claim in count three. (Dkt. #331 at 6.)  Kathryn and Mitchell assert

22  claims for aiding and abetting in count four of her complaint and count three of his. (Dkt. #331 at

23  6-7; Dkt. #332 at 6.)  Finally, they both seek punitive damages. (Dkt. #331 at 8-9; Dkt. #332 at

24  10.)

25  / / / /

26  / / / /

27  / / / /

28

1  **A. Direct Negligence**

2  1. Defendant Goldsmith

3  Defendant Goldsmith argues that he is entitled to summary judgment on this claim

4  because he was not driving and he was asleep at the time of the accident. The Slagowski and

5  Zemke Plaintiffs agree. (Dkt. #465 at 35; Dkt. #453 at 14.) I therefore grant this portion of

6  Goldsmith's motions.

7  2. Defendant Wentland

8  Defendant Wentland argues that he is entitled to summary judgment on this claim because

9  Hannon did not rely on his communication that it was clear to pass. Wentland contends that

10  Hannon testified at deposition that he could see in front of him and determined for himself

11  whether it was safe to pass the other vehicles. Wentland also contends the road was clear when

12  he communicated to Hannon and any liability he had was cut off by the unforeseeable

13  supervening causes of either Hannon choosing not to reenter the southbound lane when he could

14  have done so or Fenton not allowing Hannon to reenter the southbound lane. Wentland argues

15  that in both versions, his communication to Hannon was not a proximate cause of the accident.

16  The Slagowski and Zemke Plaintiffs respond that Hannon had approached Law's vehicle

17  as if to pass several times, but Hannon did not do so until he asked Wentland if it was clear and

18  Wentland advised him it was. Additionally, they argue Hannon knew he was going to have to

19  pass more than one vehicle so he wanted information from Wentland before he tried it. They

20  contend Wentland was far ahead of Hannon and thus in a position to warn him if it was not safe.

21  They thus contend a reasonable jury could find that Hannon relied on Wentland's communication

22  to determine it was clear to pass.[3] As to the superseding cause argument, they argue that it was

23  foreseeable that Fenton might speed up while someone else tried to pass. They also contend that

24  Hannon's attempt to pass more than one vehicle was foreseeable because Wentland had just done

25  the same thing.

26

27  _____

[3] The Zemke Plaintiffs also argue that the scheme to violate the regulations proximately caused the
28  accident. I address a similar argument in relation to the aiding and abetting claim.

To prove a negligence claim under Nevada law, the plaintiff must show: "(1) an existing duty of care, (2) breach, (3) legal causation, and (4) damages." *Turner v. Mandalay Sports Entm't, LLC*, 180 P.3d 1172, 1175 (Nev. 2008) (en banc). Nevada has not addressed whether a driver who signals another driver that the road is clear owes a duty to other motorists or pedestrians. Other jurisdictions are split on the issue, although the majority rule is that the signaling driver owes a duty of care. *See, e.g.*, *Martinez ex rel. Chavez v. Martinez*, No. E2000-01990-COA-R3-CV, 2001 WL 256152, at *1-2, 4 (Tenn. Ct. App. Mar. 15, 2001) (gathering cases and stating the majority view is that a driver who signals to another driver that the way is clear "is guilty of negligence if he or she fails to exercise due care in ascertaining that the way is clear for the other driver's intended move"); *Isaacs v. Larkin Elec. Co.*, No. 16948, 1998 WL 906394, at *4 (Ohio Ct. App. Sept. 4, 1998) (stating the "majority view" is that "a signaler may be held liable, under some circumstances, on the principle that one who acts gratuitously assumes a duty of care").[4] In those jurisdictions that adopt the majority rule, the signal is not a proximate cause of the injured party's damages unless the signaled person "actually relied" on it. *Id.* ("Only with such reliance can any act of negligence in signaling be considered a proximate cause of the plaintiff's injuries.").[5]

I need not decide whether Nevada would impose a duty on a signaling driver because no genuine factual dispute remains that Wentland's signal was not a proximate cause of the accident. At the time of the accident, it was dark but the weather was clear and the roads were straight and dry. (Dkt. #434-3 at 8, 11; Dkt. #445 at 2.) When asked at his deposition why he asked Wentland

---

[4] *See also* Restatement (Second) of Torts § 324A(c) (stating that a person "who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if . . . the harm is suffered because of reliance of the other or third person upon the undertaking").

[5] *See also Ohlhausen v. City of N.Y.*, 73 A.D.3d 89, 93-94 (N.Y. App. Div. 2010) ("[S]uch a gesture can only constitute a proximate cause of the accident where the pedestrian relied on the implicit assurance of safety."); *Ring v. Poelman*, 397 S.E.2d 824, 826 (Va. 1990) (holding that the signaling driver was entitled to summary judgment because the signaled driver testified he did not rely on the hand signal); *Dace v. Gilbert*, 421 N.E.2d 377, 377-78 (Ill. 1981) (holding there was no proximate cause where the signaled driver testified he did not rely on the signaling driver to tell him when to turn).

if it was clear to pass, Hannon responded that "it's just something truck drivers do. I mean, you ask--you just ask. . . . There might be something in the road. There might be deer. There might be whatever." (Dkt. #434-3 at 12-13.) Hannon knew that passing multiple vehicles on a two-lane road in the dark is dangerous and he wanted to be particularly careful, so he asked for Wentland's input. (*Id.* at 13.)

However, Hannon also testified that before he moved into the northbound travel lane, he was able to look into that lane for any oncoming headlights and he did not see any. (*Id.* at 12, 17.) After moving into the northbound lane, Hannon saw four vehicles in front of him in the southbound lane: Law's SUV, Fenton's truck, and two flatbed trucks. (*Id.* at 17.) He also saw that there was room for him to pass Law and Fenton and get behind the first flatbed. (*Id.* at 20.) Hannon thus was not concerned about whether he could pass Law and Fenton and safely get back into the southbound lane. (*Id.*) Fenton and Law likewise testified that Hannon could have gotten back into the southbound lane. (Dkt. #434-7 at 6; Dkt. #434-8 at 6; Dkt. #466-9 at 5, 7.) Hannon testified that after making these observations, he was "going to go ahead and continue my pass. It's still clear. There's nothing coming." (Dkt. #434-3 at 17.)

According to Hannon, Fenton then sped up and closed the distance between Fenton's truck and the flatbed in front of him so that Hannon had no room to return to the southbound lane. (*Id.* at 17-18.) Hannon testified that it was about the time Fenton refused to let him back into the southbound lane that he noticed oncoming headlights in the northbound lane. (Dkt. #445 at 3; Dkt. #436-4 at 21.) Hannon then "made the decision to pass the flatbed, and [he] passed the first flatbed and got in between the two flatbeds." (Dkt. #434-3 at 18.) He did not consider braking and getting back into the southbound lane behind either Fenton or Law. (Dkt. #466-3 at 21.)

Viewing this evidence in the light most favorable to the plaintiffs, no issue of fact remains that Hannon did not rely on Wentland's signal in continuing with the passing maneuver. Hannon could see for himself whether it was clear to pass and he made the decision once he was in the northbound lane to continue the passing maneuver independent of Wentland's signal. The

testimony shows Hannon was in the northbound lane for some time,[6] he was able to make his own observations about whether there was oncoming traffic, and he made an independent decision to continue his passing maneuver. [7] *Compare Boucher v. Grant*, 74 F. Supp. 2d 444, 452 (D. N.J. 1999) (holding that the signaled driver's "fleeting hesitation" before pulling out of a gas station within seconds of a postal employee's hand signal did not "support a finding that he did not rely on the postal employee's hand wave"), *with Dace v. Gilbert*, 421 N.E.2d 377, 377-78 (Ill. 1981) (holding no issue of fact that proximate cause was lacking where the signaled driver "waited one minute after receiving [the signaling driver's] signal before turning left; that he could observe glaring headlights of oncoming cars; that he used his own vision to determine if he could turn safely, and that he did not rely on [the signaling driver] to tell him when to turn").  I therefore grant this portion of Wentland's summary judgment motions.

### 3.  Defendant Hannon

Defendant Hannon does not move for summary judgment on count one.

### 4.  Defendant CWA

Defendant CWA did not move for summary judgment on count one because it concedes that it may be vicariously liable if any of its drivers is found liable for negligently causing the accident.  The plaintiffs respond that in addition to vicarious liability, they pled a negligent entrustment claim against CWA.  The plaintiffs contend that issues of fact remain on that claim because (1) CWA let Hannon, Goldsmith, and Wentland drive the trucks despite knowing that

---

[6] (Dkt. #445 at 3.)

[7] According to Fenton, right after Wentland communicated to Hannon, he saw Hannon's truck "roughly at the back of [his] trailer." (Dkt. #456-5 at 5.)  Fenton testified that he then grabbed his mike to tell Hannon it was not clear because he already saw oncoming headlights. (*Id.*)  Fenton avers that by that time, Hannon was directly next to him. (*Id.*)

Taking this testimony as true, Hannon did not rely on Wentland's communication because he had already passed the Law vehicle and was at the rear of Fenton's truck when Wentland first communicated to him. At that point, Hannon testified he was able to see whether there was oncoming traffic, and Fenton likewise testified oncoming traffic was visible. Under this version of the facts, Hannon had already made the decision to make the pass before Wentland communicated to him, as he had been in the northbound lane long enough to pass the Law SUV and close the gap between the Law SUV and the Fenton truck, and was pulling alongside Fenton. Additionally, for the same reasons already discussed, Hannon had sufficient time and visibility to make his own observations and decisions about whether it was clear to pass.

1   they had violated the hours-of-service rules on the same trip two weeks before, (2) the drivers had

2   a history of prior hours-of-service violations, and (3) the drivers were not qualified to drive

3   because their files did not contain required documentation.  The plaintiffs contend that by failing

4   to move on this claim, CWA has waived its right to seek summary adjudication.

5        In reply, CWA argues that the plaintiffs abandoned their negligent entrustment claim by

6   representing to this court in other papers that the only basis for CWA's liability in count one was

7   vicarious.  Alternatively, it argues that the alleged lack of documentation does not show the

8   drivers were unfit and there is no correlation between the lack of documentation and the accident.

9   As to negligent entrustment based on fatigued driving, CWA argues that there is no evidence that

10   Hannon had a history of driving while fatigued or that CWA knew about it.

11        I do not find the plaintiffs abandoned their negligent entrustment claim.  The Slagowski

12   Plaintiffs made comments in relation to their motion to amend that suggested the only direct

13   claim against CWA was the aiding and abetting claim. (Dkt. #296 at 4 (stating that their "original

14   complaint alleged motor-vehicle negligence against the three independent drivers and *vicarious*

15   liability on CWA as the employer of those drivers.  In contrast the new [aiding and abetting

16   claim] alleges *direct* liability against CWA and is thus potentially a much stronger claim,

17   particularly on the punitive damages issues."), 8 ("Plaintiffs' original claim alleges punitive

18   damages against CWA based on the vicarious liability of their employees."); Dkt. #306 at 15 and

19   18 (repeating these arguments).)  The Zemke Plaintiffs joined in these documents. (Dkt. Nos. 297,

20   298, 308, 309.)

21        However, I did not rely on these comments in deciding whether to grant leave to amend.

22   (*See* Dkt. #328.)  CWA has not identified any prejudice resulting from these comments.  It does

23   not state, for example, that it would have conducted different discovery or engaged in a different

24   strategy.  Rather, the evidence the parties cite suggests that similar evidence was at issue with

25   respect to the aiding and abetting claim.  I therefore will not deem this claim to be waived.

26        But I also will not deem CWA to have waived its right to seek summary judgment on this

27   claim.  The plaintiffs' statements could have led CWA to reasonably believe that the negligent

28

1    entrustment claim was abandoned.  It is unclear why CWA's counsel did not call the plaintiffs'

2    counsel to clear up any confusion prior to the dispositive motion deadline.  But I nevertheless will

3    evaluate whether genuine issues of fact remain on this claim.

4             The plaintiffs offer two theories on how CWA negligently entrusted its trucks to the

5    drivers.  First, they argue CWA lacks documentation in the drivers' files that it is required to

6    maintain under federal regulations.  Second, they argue that Hannon, Wentland, and Goldsmith

7    had a history of driving beyond the hours-of-service limit in federal regulations and that CWA

8    knew it but nevertheless continued to allow them to drive its trucks.

9             CWA responds that the first theory does not support a negligent entrustment claim

10   because the failure to maintain certain documents did not cause the accident.  CWA also argues

11   that the plaintiffs have not shown that in fact Hannon was unqualified to drive.  As to the second

12   theory, CWA argues this claim must be predicated solely on Hannon's alleged fatigued driving

13   because only Hannon's driving could have proximately caused the accident.  CWA contends

14   there is no evidence Hannon was fatigued on the day of the accident.  CWA also argues that there

15   is no evidence that Hannon had a history of driving in a fatigued state or that CWA knew he had

16   such a history.  Finally, CWA contends that a negligent entrustment claim is duplicative of its

17   vicarious liability.

18            To show negligent entrustment, the plaintiffs must prove that CWA knowingly entrusted a

19   vehicle to "an inexperienced or incompetent person," causing the injured party's damages. *Zugel*

20   *by Zugel v. Miller*, 688 P.2d 310, 312 (Nev. 1984).  There is no dispute that CWA entrusted its

21   vehicles to its employees.  The only questions are whether that entrustment was negligent and

22   whether there is a causal connection between the negligence and the resulting damages.

23                              *a. Lack of Documentation*

24            The lack of documentation in the drivers' files had no causal connection with the accident.

25   The plaintiffs present no evidence that the drivers were actually unfit to drive based on any of the

26

27

28

1    information that should have been contained in CWA's files but was not.[8]  Instead, the plaintiffs

2    identify only a recordkeeping violation.  I therefore grant summary judgment in CWA's favor on

3    this aspect of the plaintiffs' negligent entrustment claims.

4                          *b. Hours-of-Service Violations*

5           Viewing the evidence in the light most favorable to the plaintiffs, genuine issues of fact

6    remain on their negligent entrustment claims based on the theory that Hannon was fatigued, he

7    had a history of driving long hours (which risks fatigued driving), and CWA knew it but

8    nevertheless let him drive its trucks.

9           First, a reasonable jury could find Hannon was fatigued.  Hannon began work that day at

10   4:15 a.m. and drove for a little over eight hours in the morning.[9] (Dkt. #436-4 at 8.)  When they

11   stopped for fuel around 12:30 p.m., Wentland began driving and Hannon went into the truck's

12   sleeper berth. (*Id.* at 8, 17, 19.)  The drivers arrived at Ely around 5:00 p.m. (Dkt. #436-5 at 10.)

13   At Ely, Hannon took over driving the other truck for Goldsmith after stopping for only a few

14   minutes to get fuel. (Dkt. #436-4 at 5-6.)  The accident occurred around 6:30 p.m. (Dkt. #466-1 at

15   4.)  Hannon proceeded with a maneuver that Doreen Law identified as too dangerous to attempt

16   herself in an SUV. (Dkt. #466-9 at 7.)  Hannon testified that he would not normally pass more

17   than one vehicle at a time, and he acknowledged it was dangerous to pass multiple vehicles on a

18   two-lane highway. (Dkt. #436-4 at 9; Dkt. #466-3 at 10.)  Hannon nevertheless attempted to pass

19   several vehicles and he continued that pass instead of braking even after he saw oncoming

20   headlights. (*See* Dkt. #466-7 at 6 (describing symptoms of fatigue including impaired

21   concentration, impaired judgment, confused thinking, and inattention); Dkt. #466-15 at 4

22

23          [8] Hannon avers that he has had a commercial driver's license since 1983, had no accidents in the
     10 years preceding the accident, and had only one minor moving violation in the 10 years preceding the
24   accident. (Dkt. #436-9 at 2-3.)  He also avers that he never drank alcohol or took drugs while on duty and
     has never been diagnosed with a sleep disorder. (*Id.* at 3.)  The plaintiffs present no evidence to the
25   contrary.

26          [9] Hannon testified he stopped driving after two hours in the morning but in his logbook, he
     indicated that he drove from 4:15 a.m. to 12:30 p.m. (Dkt. #436-4 at 17; Dkt. #466-17.)  Wentland did not
27   recall exactly when he took over, but his timeline suggested it was closer to the time in Hannon's logbook.
     (Dkt. #436-6 at 10.)  Viewing the facts in the light most favorable to the plaintiffs, Hannon drove eight
28   hours in the morning, took a break in the sleeper for a few hours, and resumed driving around 5:00 p.m.

1 (identifying Hannon's errors as evidence of fatigue).)  Additionally, Hannon's version differs

2 from other witness accounts from the evening.  Hannon contends he safely returned to the

3 southbound lane while the Zemke vehicle was still 500 yards or more in front of him. (Dkt. #436-

4 4 at 13.)  Other witnesses state Hannon was still in the northbound lane when Zemke was forced

5 off the road to avoid a head-on collision. (Dkt. #466-9 at 8; Dkt. #466-10 at 7; Dkt. #466-12 at 8,

6 10-11.)

7   Hannon denies he was fatigued, and Wentland denies that he saw any signs Hannon was

8 fatigued. (Dkt. #436-9 at 4; Dkt. #436-10 at 4.)  However, viewing the facts in the light most

9 favorable to the plaintiffs, a reasonable jury could find Hannon had been driving a long time that

10 day because he started the day early in the morning and drove for approximately eight hours, took

11 less than a five hour break, and was driving again for another hour and a half when the accident

12 occurred.  The amount of time Hannon spent on the road combined with his decision-making

13 could lead a reasonable jury to infer he was fatigued.  Additionally, a reasonable jury could infer

14 that part of the reason for the discrepancy between Hannon's version and other witnesses'

15 versions, is that Hannon was fatigued and thus he was not accurately perceiving the relative

16 speeds and locations of the various vehicles.

17   Additionally, viewing the facts in the light most favorable to the plaintiffs, a reasonable

18 jury could find that Hannon had a history of driving long hours in excess of the limits set in the

19 federal safety regulations, which are designed to prevent fatigued driving by commercial drivers.

20 As discussed more fully in my Order on the plaintiffs' spoliation motion, I will instruct the jury

21 that CWA lost or destroyed the logbooks from the day of the accident, as well as pre-accident

22 logbooks and hours-of-service records, at a time when it knew or should have known those

23 documents were relevant to anticipated litigation.  I will further instruct the jury that CWA's

24 conduct creates a rebuttable presumption that if these documents had been produced, they would

25 show information favorable to the plaintiffs and unfavorable to CWA.  The plaintiffs have also

26 identified what they contend are several instances of potential hours-of-service violations by

27

28

1   Hannon based on the records that have been produced. (Dkt. #494-2.)  Whether CWA will be able

2   to rebut the presumption or explain these potential violations will be up to the jury.

3          A reasonable jury could find that CWA knew of prior instances of Hannon driving for

4   long hours.  Brett Wolfe, CWA's truck manager, testified that "any time that [CWA] send[s]

5   drivers where they're required to run on a logbook, when they get back and they hand them in,

6   with the timecards, I'll grab them and glance through them." (Dkt. #466-5 at 5, 8, 11, 13.)  He

7   also testified he reviews timecards and investigates any potential hours-of-service violations. (*Id.*

8   at 10.)  And he testified that he had seen records and logbooks documenting Hannon's hours-of-

9   service.[10] (Dkt. #466-6 at 7-8.)  Viewing this evidence and reasonable inferences in the plaintiffs'

10  favor, if the jury finds those records would show Hannon previously had driven for long hours,

11  the jury also could find that Wolfe was aware of those prior instances based on his review of the

12  records.  A reasonable jury thus could find that CWA was armed with the knowledge that one of

13  its drivers had a history of working long hours in violation of regulations designed to prevent

14  fatigued driving, and CWA negligently took the risk that he might continue to drive long hours,

15  and potentially drive while fatigued, if it entrusted its vehicle to him.  I therefore deny summary

16  judgment in CWA's favor on the negligent entrustment claim.

17                    *c.  Negligent Entrustment is not Redundant of Vicarious Liability*

18          The plaintiffs' claim that CWA negligently entrusted its truck to Hannon is not duplicative

19  of vicarious liability.  The Supreme Court of Nevada has not addressed this issue.  Federal judges

20  in the District of Nevada are split on the issue. *Compare Alvares v. McMullin*, No. 2:13-CV-

21  02256-GMN-CWH, 2015 WL 3558673, at *3 (D. Nev. June 4, 2015) (predicting Nevada would

22  hold that a negligent entrustment claim that is premised on an employee's negligent act is barred

23  as duplicative if respondeat superior liability is established) *and Adele v. Dunn*, No. 2:12-CV-

24  00597-LDG-PAL, 2013 WL 1314944, at *2 (D. Nev. Mar. 27, 2013) ("The court predicts that

25  Nevada would adopt the majority rule such that, in situations in which a motor carrier admits

26  _____

27          [10] Wolfe also testified that once Hannon became a supervisor, he did not check Hannon's
     timecards. (Dkt. #466-6 at 33.)  However, I must view the evidence and inferences in the light most
28  favorable to the plaintiffs.

1    vicarious liability for the conduct of a driver, direct claims of negligent entrustment or negligent

2    training and supervision against a motor carrier would be disallowed where those claims are

3    rendered superfluous by the admission of vicarious liability."), *with Wright v. Watkins & Shepard*

4    *Trucking, Inc.*, 968 F. Supp. 2d 1092, 1095 (D. Nev. 2013) (predicting the Supreme Court of

5    Nevada would not adopt this approach).

6          I predict[11] that the Supreme Court of Nevada would hold that a negligent entrustment

7    claim is not redundant of vicarious liability, particularly where, as here, punitive damages are

8    sought.  The argument that the two claims are redundant is based on three considerations:

9    (1) evidence of negligent entrustment is unnecessary because it is just another theory of holding

10   the employer liable for the employee's negligence; (2) "the plaintiff cannot recover any more in

11   damages [for a negligent entrustment claim] than he would recover under a theory of respondeat

12   superior"; and (3) evidence of negligent entrustment "would likely be irrelevant and

13   inflammatory." *Alvares*, 2015 WL 3558673, at *3; *see also McHaffie By & Through McHaffie v.*

14   *Bunch*, 891 S.W.2d 822, 826 (Mo. 1995) (en banc).

15         As to the first rationale, however, negligent entrustment is not just a means to hold the

16   employer liable for the employee's negligence.  Rather, it is a separate tort that addresses the

17   employer's own negligent conduct. *Wright*, 968 F. Supp. 2d at 1095.  As to the second and third

18   rationales, the evidence of negligent entrustment is not irrelevant and may result in different

19   damages awards where punitive damages are involved. *See McHaffie*, 891 S.W.2d at 826

20   (suggesting its rule that negligent entrustment is duplicative of vicarious liability may need to be

21   modified where punitive damages are sought).[12]  Additionally, punitive damages in Nevada must

22

23   _____

24         [11] When a federal court interprets state law, it is bound by the decisions of the state's highest court.
     *Assurance Co. of Am. v. Wall & Assocs. LLC of Olympia*, 379 F.3d 557, 560 (9th Cir. 2004).  Where the
     state's highest court has not decided the issue, a federal court must predict how that court would decide.
25   *Orkin v. Taylor*, 487 F.3d 734, 741 (9th Cir. 2007).  I may use "decisions from other jurisdictions, statutes,
     treatises, and restatements as guidance." *Assurance Co.*, 379 F.3d at 560 (quotation omitted).
26
           [12] *Wilson v. Image Flooring, LLC*, No. WD 75141, WD 75142, 2013 WL 1110878, at *5 (Mo. Ct.
27   App. Mar. 19, 2013) (holding that "the rule announced in *McHaffie* does not apply where punitive
     damages are claimed against the employer"); *Kwiatkowski v. Teton Transp., Inc.*, No. 11-1302-CV-W-
28   ODS, 2012 WL 1413154, at *4 (W.D. Mo. Apr. 23, 2012) (stating that "in a case where punitive damages

1   be shown by clear and convincing evidence and vicarious liability for punitive damages is not

2   automatic. *See* Nev. Rev. Stat. §§ 42.005(1), 42.007.  Evidence of the employer's conduct thus

3   may be needed to meet the clear and convincing standard.  Moreover, these rationales do not

4   support eliminating a plaintiff's cause of action. *See Wright*, 968 F. Supp. 2d at 1095.

5          Here, the plaintiffs seek punitive damages against the drivers and their employer.

6   Consequently, the negligent entrustment claim is not duplicative of CWA's vicarious liability for

7   Hannon's alleged negligence because the evidence of CWA's alleged negligent entrustment may

8   lead the jury to award a different amount of punitive damages against the employer.  Accordingly,

9   I deny summary judgment in CWA's favor on the negligent entrustment claim.

10          **B.  Aiding and Abetting**

11          To establish aiding and abetting in the civil context, a plaintiff must show (1) the primary

12   violator breached a duty that injured the plaintiff, (2) the alleged aider and abettor "was aware of

13   its role in promoting [the breach] at the time it provided assistance," and (3) the alleged aider and

14   abetter "knowingly and substantially assisted" the primary violator in committing the breach.

15   *Dow Chem. Co. v. Mahlum*, 970 P.2d 98, 112 (Nev. 1998), *overruled in part on other grounds by*

16   *GES, Inc. v. Corbitt*, 21 P.3d 11, 15 (Nev. 2001).  "The second and third elements should be

17   weighed together, that is, greater evidence supporting the second element requires less evidence

18   of the third element, and vice versa." *Id.*  "To amount to substantial assistance, [the alleged]

19   encouragement must take the form of a direct communication, or conduct in close proximity, to

20   the tortfeasor." *Id.* at 113.

21          1. Defendant Goldsmith

22          Goldsmith argues there is no evidence Hannon was fatigued.  He also argues there is no

23   evidence that he knowingly and substantially assisted Hannon in driving in a fatigued state or that

24   he was aware of his role in allegedly aiding and abetting Hannon.  According to Goldsmith, he

25   drove his own truck while Hannon and Wentland were in the other truck.  He thus contends that

26

27   are at issue, a factfinder may consider the conduct of the employer beyond the actions of the negligent
     employee and increase the exemplary award based on such conduct") (quotation omitted).

28

1   while he may have anticipated exceeding the number of hours a driver can work under federal

2   regulations, he did not know Hannon would do so and he did not aid and abet Hannon.

3          The plaintiffs respond that the three CWA drivers agreed before they left that they would

4   drive to Las Vegas, and thus Goldsmith knew that trip would require them to be on the road for

5   more than 14 hours.  They also argue that Goldsmith was not sure who would be the one to

6   violate the rules and he thought it was possible he would not be the one in violation.  The

7   plaintiffs further argue that even if Goldsmith did not know when they first set out who would

8   violate the rules, when the drivers stopped in Ely and Goldsmith entered the sleeper berth,

9   Goldsmith had to know that Wentland, Hannon, or both would violate the hours-of-service rules

10  if they continued on to Las Vegas without stopping.

11         I have already ruled that a reasonable jury could find Hannon was fatigued.  However,

12  there is no evidence raising a genuine issue of fact that Goldsmith was aware of his role in

13  promoting Hannon to drive fatigued at the time he allegedly provided assistance, or that he

14  knowingly and substantially assisted Hannon in driving fatigued.  The three drivers agreed to a

15  general plan to drive until they got to Las Vegas. (Dkt. #466-2 at 6; Dkt. #466-3 at 4; Dkt. #466-4

16  at 7.)  They knew that this would mean at least one of them would violate the federal hours-of-

17  service rules. (Dkt. #466-2 at 6.)  And even if Goldsmith initially was not sure who that might be,

18  he knew or should have known as of the time he entered the sleeper berth at Ely that Hannon,

19  Wentland, or both would violate the rules by the time they got to Las Vegas.

20         However, knowing they would violate the hours-of-service rules is not the same as

21  knowingly encouraging Hannon to drive while fatigued.  The hours-of-service rules are designed

22  to keep fatigued drivers off the road, so Goldsmith knew or should have known that their plan to

23  drive to Las Vegas risked the potential for one or more of them to be fatigued.  But that does not

24  mean a driver who exceeds the hours-of-service rules is in fact fatigued, and there is no evidence

25  Goldsmith knew Hannon was fatigued and encouraged or assisted him to drive while fatigued.

26  Goldsmith spent most of the day in question in a separate vehicle from Hannon.  There is no

27  evidence Goldsmith saw any signs that Hannon was fatigued while Hannon was driving (such as

28

1   swerving or dangerous driving maneuvers), and there is no evidence Goldsmith saw any signs

2   Hannon was fatigued when they stopped in Ely (such as Hannon yawning or expressing he was

3   tired).  Aiding and abetting a violation of the regulations does not automatically equate to aiding

4   and abetting fatigued driving, and there is no evidence that Goldsmith knowingly and

5   substantially assisted Hannon in driving fatigued.  I therefore grant summary judgment in

6   Goldsmith's favor on these claims.

7                  2.  Defendant Wentland

8          Wentland argues that there is no evidence Hannon was fatigued.  He also argues he was

9   not aware of his role nor did he knowingly and substantially assist Hannon in driving in a fatigued

10  state.  Wentland contends that his failure to act to prevent an hours-of-service violation does not

11  suffice to support a claim that he aided and abetted Hannon driving in a fatigued state.

12         The plaintiffs respond that Wentland agreed to the plan knowing that it would create a

13  substantial risk that one or more of them would be driving while fatigued.  Additionally, because

14  Wentland and Hannon were in the same truck, Wentland had to know that Hannon would violate

15  the 14-hour rule about an hour outside Ely.  The plaintiffs also argue the "all clear" message

16  aided and abetted Hannon's risky passing maneuver.  Wentland replies that his signal to Hannon

17  that it was clear to pass did not aid and abet Hannon because the passing maneuver itself was not

18  the wrongful act, it was the failure to yield the right of way, which he did not encourage.

19         The same analysis discussed above with respect to Goldsmith applies to Wentland.

20  Although Wentland spent the day in the truck with Hannon, and thus had more opportunity to

21  observe him and know his activities, there is no evidence Wentland saw any signs that Hannon

22  was fatigued while Hannon was driving or when they stopped in Ely.  Rather, Wentland denies he

23  saw any indication that Hannon was fatigued. (Dkt. #434-10 at 4.)  Again, aiding and abetting a

24  violation of the regulations does not automatically equate to aiding and abetting fatigued driving,

25  and there is no evidence that Wentland knowingly and substantially assisted Hannon in driving

26  fatigued.  I therefore grant summary judgment in Wentland's favor on this claim.

27

28

1    Additionally, Wentland is not liable for aiding and abetting the passing maneuver. This

2    theory was not alleged in the amended complaints. (Dkt. Nos. 329, 331, 332.)  Moreover, as

3    discussed above, Wentland's signal did not proximately cause the accident. Further, the passing

4    maneuver itself was not wrongful. It was Hannon's alleged failure to yield the right of way

5    (whether because Hannon was negligent or Fenton refused to let him back into the southbound

6    lane) that was the allegedly wrongful act. There is no evidence Wentland knowingly and

7    substantially assisted Hannon's failure to yield the right of way.

8                    3.  Defendant Hannon

9    Hannon argues that the plaintiffs' aiding and abetting claims are based on the allegation

10   that the other drivers and CWA aided and abetted him to drive in a fatigued state, but he cannot

11   aid and abet himself. The plaintiffs respond that Hannon aided and abetted Wentland to drive

12   while fatigued. The Slagowski Plaintiffs also argue that Hannon could be liable for concert of

13   action. Hannon replies that the claim that Hannon aided and abetted Wentland is newly raised for

14   the first time in response to his motion. He also argues that he could not aid and abet Wentland

15   because they were in different trucks so he had no knowledge of whether Wentland was fatigued.

16   He also contends the Slagowski Plaintiffs' concert of action claim was not pled in the amended

17   complaint and was raised for the first time at summary judgment.

18   The plaintiffs appear to concede that Hannon cannot aid and abet himself. Because I have

19   ruled that Wentland's conduct was not a proximate cause of the accident, Hannon cannot be liable

20   for aiding and abetting Wentland.

21   Finally, the Slagowski Plaintiffs did not allege a concert of action claim in their amended

22   complaint. Concert of action is a separate claim from aiding and abetting under Nevada law and

23   requires proof of different elements. *See Dow Chem. Co.*, 970 P.2d at 111-12 (distinguishing

24   concert of action from civil conspiracy and aiding and abetting); *GES, Inc.*, 21 P.3d at 15 (stating

25   concert of action requires proof that the defendants "agreed to engage in conduct that is inherently

26   dangerous or poses a substantial risk of harm to others," and "[m]ere joint negligence, or an

27   agreement to act jointly, does not suffice"). They cannot assert this claim for the first time in

28

1   response to a summary judgment motion. *See, e.g.*, *Coleman v. Quaker Oats Co.*, 232 F.3d 1271,

2   1292 (9th Cir. 2000). I therefore grant summary judgment in Hannon's favor on the aiding and

3   abetting claim.

4                             4.  Defendant CWA

5          CWA argues that there is no evidence CWA engaged in any direct communication or

6   conduct in close proximity to the drivers that encouraged them to drive while fatigued. Rather,

7   CWA contends, the evidence shows it was the company's off-season and it did not instruct its

8   driver to rush or to reach Las Vegas in one day. CWA also contends it did not communicate with

9   its drivers that day so it had no knowledge of how many hours they had driven. CWA argues that

10  its failure to have adequate monitoring systems in place does not suffice to show active

11  encouragement for an aiding and abetting claim.

12         The plaintiffs respond that Hannon was a managing agent and CWA therefore aided and

13  abetted through Hannon's conduct. They also argue that CWA aided and abetted by paying the

14  drivers for hours they worked in violation of the hours-of-service rules. CWA replies that

15  Hannon is not a managing agent because he had no policy-making authority or authority to

16  deviate from CWA's policies.

17                          *a.  Managing Agent*

18         Even assuming Hannon was a managing agent, Hannon cannot aid and abet himself and

19  neither Wentland nor Goldsmith proximately caused the accident. Consequently, CWA could not

20  aid and abet through Hannon.

21         In any event, Hannon was not a managing agent for purposes of this case. Hannon was a

22  chip seal superintendent when working on chip seal projects, but when he was driving on the trip

23  in question, he was under Wolfe's supervision. (Dkt. #466-6 at 19-20.) There is no evidence

24  Hannon had discretion to violate the hours-of-service rules. As discussed below, he therefore was

25  not CWA's managing agent.

26  / / / /

27  / / / /

28

1

### b. Paying for Hours Worked in Violation of the Rules

2    There is no evidence that CWA actively encouraged the drivers to drive long hours the

3    day of the accident or in relation to this particular trip. According to Wolfe, at the time of this

4    trip, it was CWA's offseason, there was no hurry for the drivers to reach their destination, and "it

5    did not matter to [him] or CWA how long the trip took." (Dkt. #436-7 at 5.) He testified that he

6    told the drivers it was late in the year, the company did not need the equipment back, and to

7    "enjoy [themselves]" and to "take [their] time." (Dkt. #436-8 at 8.) Wolfe avers that he did not

8    ask the drivers about any particular schedule or plan before they left. (Dkt. #436-7 at 5.) Rather,

9    he expected they would drive approximately 10 hours per day and then stop for the night. (Dkt.

10   #436-8 at 8.) Additionally, he did not speak to them on the day of the accident. (Dkt. #436-7 at

11   5.) There is no evidence to the contrary.

12   Both experts in the case testified that in their opinion, paying the drivers for prior

13   violations encourages the drivers to violate the hours-of-service rules because the drivers make

14   more money and are not disciplined. (Dkt. #436-12; Dkt. #466-7.) However, as discussed above,

15   encouraging hours-of-service violations is not the same thing as knowingly and substantially

16   assisting or encouraging driving while fatigued. While a reasonable jury could find CWA

17   negligently risked having a fatigued driver on the road when it entrusted the vehicle to Hannon,

18   there is no evidence raising a genuine issue of material fact that CWA knowingly and

19   substantially encouraged or assisted Hannon to drive while fatigued. *See Dow Chem. Co.*, 970

20   P.2d at 113 (concluding that evidence supported a negligent undertaking claim but not an aiding

21   and abetting claim because there was no evidence the defendant knowingly supported or

22   encouraged fraudulent conduct). I therefore grant summary judgment in CWA's favor on these

23   claims.

24   **C. Loss of Consortium, Negligent Infliction of Emotional Distress**

25   The Zemkes have no remaining direct claims against Goldsmith or Wentland. Therefore,

26   Goldsmith and Wentland are also entitled to summary judgment on the Zemkes' derivative claim

27   of loss of consortium. *Turner*, 180 P.3d at 1178. Based on the facts of this case, the Zemkes'

28

1  claim against Goldsmith and Wentland for negligent infliction of emotional distress is likewise

2  derivative and must fail because there are no remaining direct claims against them. *Id.*

3      **D. Punitive Damages**

4          1. Defendants Goldsmith and Wentland

5      Goldsmith and Wentland move for summary judgment as to punitive damages, arguing

6  that if the aiding and abetting claim fails, then there is no basis to award punitive damages against

7  them. They also argue that there is no evidence of malice or oppression. The Slagowski

8  Plaintiffs do not respond to Goldsmith or Wentland's arguments regarding punitive damages.

9  The Zemke Plaintiffs argue there is sufficient evidence of a conscious disregard for the safety of

10  other motorists based on the common plan to violate the rules as well as their post-accident

11  conduct.

12      Because I have granted summary judgment on all of the claims against Goldsmith and

13  Wentland, there is no basis to award punitive damages against them. I therefore grant this portion

14  of their motions as well.

15          2. Defendant Hannon

16      Hannon argues the plaintiffs cannot show malice or oppression. The plaintiffs respond

17  that Hannon came up with the plan to violate the hours-of-service rules and he knew he would

18  violate the rules if he continued to drive past 6:00 p.m. They argue he executed a dangerous pass

19  maneuver, continued in that maneuver after Fenton warned him of oncoming headlights, and

20  failed to return to the southbound lane even though he could have done so. They also argue his

21  post-accident conduct supports the inference that he knew he had caused the accident but he did

22  not stop to render aid and tried to cover up his involvement.

23      The plaintiffs are "not automatically entitled to punitive damages." *Bongiovi v. Sullivan*,

24  138 P.3d 433, 450 (Nev. 2006). "Instead, punitive damages may be awarded when the plaintiff

25  proves by clear and convincing evidence that the defendant is 'guilty of oppression, fraud or

26  malice, express or implied.'" *Id.* at 450-51 (quoting Nev. Rev. Stat. § 42.005(1)). Oppression

27  means "despicable conduct that subjects a person to cruel and unjust hardship with conscious

28

1    disregard of the rights of the person." Nev. Rev. Stat. § 42.001(4).  Fraud means "an intentional

2    misrepresentation, deception or concealment of a material fact known to the person with the

3    intent to deprive another person of his rights or property or to otherwise injure another person."

4    *Id.* at § 42.001(2).  Malice, express or implied, means "conduct which is intended to injure a

5    person or despicable conduct which is engaged in with a conscious disregard of the rights or

6    safety of others." *Id.* at § 42.001(3).  A person acts in "conscious disregard" of a person's rights

7    and safety when he knows of "the probable harmful consequences of a wrongful act and [ ]

8    willful[ly] and deliberate[ly] fail[s] to act to avoid those consequences." *Id.* at § 42.001(1).

9    Conscious disregard requires a showing that the tortfeasor acted "with a culpable state of mind."

10   *Countrywide Home Loans, Inc. v. Thitchener*, 192 P.3d 243, 255 (Nev. 2008) (en banc).  Thus to

11   support punitive damages, the defendant's conduct "at a minimum, must exceed mere

12   recklessness or gross negligence." *Id.*

13        A reasonable jury could find punitive damages are warranted if it finds Hannon acted in

14   conscious disregard of the rights and safety of other motorists.  Hannon knew he was subject to

15   hours-of-service regulations and he knew the reason those regulations were in place was to

16   prevent fatigued driving and to protect other drivers on the road. (Dkt. #466-3 at 4; Dkt. #466-5 at

17   36.) He nevertheless started driving at Ely even though he knew he had been driving a long time

18   that day and had not taken a sufficient break to reset his hours-of-service.  In the face of this

19   knowledge, Hannon planned to drive for several more hours to get to Las Vegas and thus he knew

20   he would exceed the hours-of-service limit in the regulations.  A reasonable jury could find this

21   behavior was in conscious disregard of the risk that he would be fatigued.  He then attempted a

22   dangerous passing maneuver of multiple vehicles on a two-lane highway in the dark.  A

23   reasonable jury could find Hannon refused to yield the right of way to complete that pass rather

24   than braking and getting back behind Fenton or Law.  Finally, a reasonable jury could find

25   Hannon then fled the scene rather than stopping to render aid. (Dkt. #466-12 at 10.)  I therefore

26   deny Hannon's summary judgment motion on punitive damages.

27        3. CWA

28

1       CWA argues the only basis for punitive damages against it is the aiding and abetting

2   claim.  CWA also argues that there is no evidence that CWA acted with malice or oppression.

3   Additionally, CWA contends it cannot be vicariously liable for punitive damages except in

4   circumstances not applicable here.

5       The plaintiffs respond that Hannon and Wolfe are managing agents for CWA and CWA

6   may be liable for punitive damages based on its managing agents' acts.  They also argue CWA

7   knew its drivers committed hours-of-service violations but it did not discipline them and instead

8   paid them for the excess hours.  The plaintiffs thus argue CWA authorized and ratified its

9   employees' conduct.  Finally, the plaintiffs contend that CWA may be liable for punitive damages

10  because it knew its employees were unfit but it entrusted its vehicles to them anyway.  The

11  plaintiffs contend the drivers were unfit because the drivers' personnel files lacked the requisite

12  documentation and Wolfe knew they had a history of violating the hours-of-service rules.

13      CWA replies that Hannon is not a managing agent because he had no policy-making

14  authority or authority to deviate from CWA's policies.  CWA also contends that failure to

15  discipline does not constitute authorization of the conduct.  CWA argues that its alleged

16  authorization of Goldsmith and Wentland's violations of the hours-of-service rule does not show

17  it authorized Hannon to drive in a fatigued state.  Finally, CWA argues that it did not ratify

18  Hannon's actions because neither failure to discipline nor the decision to pay drivers rises to the

19  level of malice or oppression.

20      Because I have dismissed the aiding and abetting claim against CWA, that claim does not

21  provide a basis to award punitive damages.  Additionally, because neither Goldsmith nor

22  Wentland proximately caused the accident, CWA cannot be subject to punitive damages based on

23  authorizing or ratifying their conduct.  Further, I have explained why the lack of documentation in

24  the drivers' files has no causal connection to the accident.  However, CWA's own conduct in

25  relation to the negligent entrustment claim supports allowing the punitive damages question to go

26  to the jury.

27

28

In Nevada, when punitive damages are sought against an employer for the wrongful act of its employee, the employer is not liable for punitive damages unless:

> (a) The employer had advance knowledge that the employee was unfit for the purposes of the employment and employed the employee with a conscious disregard of the rights or safety of others;
>
> (b) The employer expressly authorized or ratified the wrongful act of the employee for which the damages are awarded; or
>
> (c) The employer is personally guilty of oppression, fraud or malice, express or implied.

Nev. Rev. Stat. § 42.007(1). Where the employer is a corporation, it may only be held liable for the actions of its employees if these factors "are met by an officer, director or managing agent of the corporation who was expressly authorized to direct or ratify the employee's conduct on behalf of the corporation." *Id.* at § 42.007(1). Determining who is a managing agent does not turn on the employee's title as a manager or supervisor. *Nittinger v. Holman*, 69 P.3d 688, 691-92 (Nev. 2003) (en banc). Rather, an employee is a managing agent if the employee has discretion and control over an area of the business sufficient to set policy for the business. *Id.* Where an employee does not have discretion to deviate from established policy, that employee is not a managing agent. *Id.* at 692.

CWA does not dispute that Wolfe is a managing agent. He was the truck manager, was "responsible for the day-to-day operations of CWA's commercial motor vehicle drivers," and was given discretion over how to monitor and enforce compliance with safety regulations for CWA's trucking operations. (Dkt. #436-7 at 3, 7; Dkt. #436-8 at 4; Dkt. #466-5 at 5, 6; Dkt. #466-6 at 19, 26, 30-31.) As discussed above, a reasonable jury could find that Wolfe knew Hannon had a history of driving long hours in excess of the limits in federal safety regulations, which Wolfe knew are designed to prevent fatigued driving by commercial drivers,[13] but he nevertheless entrusted CWA's vehicle to Hannon for a long-distance trip. A reasonable jury thus could find Wolfe acted in conscious disregard for the safety of other motorists. Consequently, I deny CWA's summary judgment motion with respect to punitive damages.

---

[13] (Dkt. #466-5 at 23; Dkt. #466-6 at 12.)

## II. CONCLUSION

IT IS THEREFORE ORDERED that defendant Donald Frank Hannon's motion for partial summary judgment **(Dkt. #430) is GRANTED in part and DENIED in part**. I grant judgment in Hannon's favor on the Slagowski Plaintiffs' aiding and abetting claim. I deny his request for judgment on punitive damages.

IT IS FURTHER ORDERED that defendant Donald Frank Hannon's motion for partial summary judgment **(Dkt. #431) is GRANTED in part and DENIED in part**. I grant judgment in Hannon's favor on the Zemke Plaintiffs' aiding and abetting claim. I deny his request for judgment on punitive damages.

IT IS FURTHER ORDERED that defendant Jerry Goldsmith's motion for summary judgment **(Dkt. #432) is GRANTED**. I grant judgment in Jerry Goldsmith's favor on all of the Slagowski Plaintiffs' claims against him.

IT IS FURTHER ORDERED that defendant Jerry Goldsmith's motion for summary judgment **(Dkt. #433) is GRANTED**. I grant judgment in Jerry Goldsmith's favor on all of the Zemke Plaintiffs' claims against him.

IT IS FURTHER ORDERED that defendant James Wentland's motion for summary judgment **(Dkt. #434) is GRANTED**. I grant judgment in James Wentland's favor on all of the Slagowski Plaintiffs' claims against him.

IT IS FURTHER ORDERED that defendant James Wentland's motion for summary judgment **(Dkt. #435) is GRANTED**. I grant judgment in James Wentland's favor on all of the Zemke Plaintiffs' claims against him.

IT IS FURTHER ORDERED that defendant Central Washington Asphalt's motion for summary judgment **(Dkt. #436) is GRANTED in part and DENIED in part**. I grant judgment in Central Washington Asphalt's favor on the Slagowski Plaintiffs' aiding and abetting claim. I deny judgment on the negligent entrustment claim, and I deny Central Washington Asphalt's request for judgment on punitive damages.

1    IT IS FURTHER ORDERED that defendant Central Washington Asphalt's motion for

2  summary judgment **(Dkt. #437) is GRANTED in part and DENIED in part**.  I grant judgment

3  in Central Washington Asphalt's favor on the Zemke Plaintiffs' aiding and abetting claim.  I deny

4  judgment on the negligent entrustment claim, and I deny Central Washington Asphalt's request

5  for judgment on punitive damages.

6    DATED this 7th day of March, 2016.

7                                                     ANDREW P. GORDON
                                                       UNITED STATES DISTRICT JUDGE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28